**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL WEATHERSBEE, Derivatively on behalf of LONGFIN CORP., | |
| Plaintiff, | Case No. |
| vs. | **VERIFIED STOCKHOLDER** <u>**DERIVATIVE COMPLAINT**</u> |
| VENKAT S. MEENAVALLI, VIVEK KUMAR RATAKONDA, YOGESH PATEL, LINGA MURTHY GADDI, ANDY ALTAHAWI f/k/a AMRO IZZELDEN ALTAHAWI, GHANSHYAM DASS, DAVID NICHOLS, and JOHN PARKER, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| LONGFIN CORP., | |
| Nominal Defendant. | |

Plaintiff Michael Weathersbee ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Longfin Corp. ("Longfin" or the "Company"), submits this Verified Stockholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, which included, *inter alia*, review and analysis of: (i) regulatory filings made by Longfin with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Longfin; (iii) other publicly available information, including media and analyst reports, concerning Longfin; (iv) filings in the pending securities class action captioned *Malik v. Longfin Corp., et al.*, Case No. 1:18-cv-04953-DLC (S.D.N.Y.) ("Securities Class Action"); and (v) documents filed in a

related civil action pending before this Court captioned *SEC v. Longfin Corp., et al.*, No. 1:18-cv-2977-DLC.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action asserting claims for breaches of fiduciary duty, abuse of control, corporate waste, and unjust enrichment brought on behalf of nominal defendant Longfin against certain officers and members of the Company's Board of Directors (the "Board").

2.      Longfin operates as a finance and technology company in the United States and internationally.  The Company specializes in structured trade finance solutions and physical commodities finance solutions for finance houses and trading platforms.  It also purports to offer Blockchain technology solutions for small and medium enterprises, processors, manufacturers, importers, and exporters.

3.      The Company is headquartered in New York, New York, and its Class A Stock was traded under the ticker symbol "LFIN" on NASDAQ from December 13, 2017 until April 6, 2018 – when the stock's trading was halted.  The Class A Stock resumed trading on the Over the Counter Market ("OTC") on May 24, 2018.

4.      Since the Company's incorporation on February 1, 2017, the Individual Defendants (as defined below) have repeatedly made, and caused the Company to make, false and misleading statements to the Securities and Exchange Commission ("SEC") and the public regarding Longfin's business and business prospects.

5.      The Individual Defendants made false and misleading statements related to, (i) the failure of the Company's Class A Stock to satisfy the listing requirements set forth in NASDAQ Listing Rule 5505(a); (ii) the spurious nature of the Company's entire Regulation A Offering, specifically that the shares had been sold to the public without properly observing the requirements

of Regulation A; (iii) the fact that all publicly held or traded Class A Stock had been issued in non-exempt transactions involving unregistered securities; (iv) the individual defendants knowingly granted a significant number of shares in the public float free of consideration to insiders, who were in turn selling such shares in the marketplace for their own benefit rather than that of the Company; and (v) the assertion that Longfin was a "global fintech company powered by artificial intelligence (AI) and machine learning."

6.     The Individual Defendants' engaged in a fraudulent and manipulative scheme to enrich themselves and their affiliates by creating a public market for Longfin's securities. Furthermore, the Individual Defendants artificially inflated the trading price of the Company's Class A Shares by issuing numerous false or misleading statements of fact, failing to disclose material information to public investors, and, with respect to at least Defendant Andy Altahawi f/k/a Amro Izzelden Altahawi ("Altahawi"), engaging in wash trades designed to simulate market activity.   After artificially inflating the Company's share price, the Individual Defendants unlawfully engaged in insider trades and enriched themselves by selling their Class A Shares at the artificially inflated prices.

7.     Specifically, the Individual Defendants inflated the trading price of Class A Shares by making materially false and misleading statements or omitting material statements of fact concerning, *inter alia*:  (i) Longfin's eligibility to list its Class A Stock on NASDAQ; (ii) the Company's compliance with requirements to conduct a public offering under Regulation A; (iii) the number of Class A Shares issued pursuant to the Regulation A Offering; (iv) Longfin's Class A Stock's public float; (v) the Company's acquisition of Ziddu.com from Meridian Enterprises Pte. Ltd. ("Meridian Enterprises") and related party transactions attendant thereto; (vi) Ziddu.com's involvement with blockchain technologies, operational status, revenue, and

value; (vii) the identities and qualifications of Longfin's board members, officers, and key employees; (viii) material weaknesses in the Company's internal controls over financial reporting and operations; (ix) the Company's operations and profitability; and/or (ix) the fact that the Company was ineligible for inclusion in the FTSE Russell ("Russell") indices.

8.      Each of the Individual Defendants' misrepresentations and omissions were material because they were designed to, and did, entice the public into purchasing unregistered securities (Class A Shares) which were nothing more than a vehicle for the Defendants' personal enrichment.  As detailed herein, when the extent of Longfin's fraudulent conduct was revealed, the trading price of Longfin's Class A Stock plummeted, severely damaging the Company and its prospects.

9.      On March 26, 2018, Citron Research ("Citron"), a market commentator, submitted a post via Twitter that accused the Company of inaccuracies in its financial reporting and fraud. The same day, Russell issued a statement announcing that Longfin would be removed from its global indices after market close on March 28, 2018, approximately 12 days after the Class A Stock was added.

10.     On March 27, 2018, CNBC published an article entitled "Longfin loses more than a third of its value after the controversial cryptocurrency stock is booted from the Russell 2000 index."

11.     Then, on April 2, 2018, Longfin filed its annual report with the SEC on Form 10-K for the 2017 fiscal year (the "2017 10-K").  The 2017 10-K revealed for the first time that Longfin was the subject of an SEC investigation (which led to a Court-imposed freeze on $27 million in illicit trading proceeds), suffered from a multitude of material weaknesses in its internal

controls over financial reporting, and was subject to a "going concern" qualification from its auditors.

12.     On April 6, 2018, a complaint filed by the SEC against Longfin was unsealed and made public, and trading of Longfin's Class A Stock was halted on NASDAQ.  On May 29, 2018, the SEC filed an amended complaint against Longfin, Venkata S. Meenavalli ("Meenavalli"), Altahawi Suresh Tammineedi ("Tammineedi"), and Dorababu Penumarthi ("Penumarthi").[1]  On May 14, 2018, Longfin voluntarily delisted its Class A Stock from NASDAQ by filing a Form 25 with the SEC.

13.     On May 24, 2018, the Company's Class A Stock was officially delisted from NASDAQ.  The same day, the Class A Stock began trading on the OTC, with an opening price of $5.05.

14.     The Individual Defendants' fraudulent and manipulative conduct, and false or misleading statements and omissions caused the Class A Stock's trading price to surge to a Class Period high of $142.82 on December 18, 2017, only to decline 96.46% to an opening price of $5.05 on May 24, 2018 – the date on which the stock became a tradeable asset after the April 6, 2018 trading halt.  The Company's market capitalization has also greatly decreased and is now only approximately $110 million.

15.     The Individual Defendants breached their fiduciary duties of loyalty and good faith by willfully engaging in the deceptions alleged herein.  As a direct and proximate result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duties, Longfin has sustained substantial damages as described below.

_____

[1] The SEC's amended complaint, captioned *SEC v. Longfin Corp., et al.*, 18-cv-02977-DLC, Dkt. No. 67, is incorporated herein by reference.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over the claims in this case under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over the defendants in this case because they are citizens of New York or they engaged in conduct in New York from which the claims arise.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1931(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants conducted business here and engaged in numerous activities that had an effect in this District.

## PARTIES

19.     Plaintiff is, and was at relevant times, a stockholder of Longfin.  Plaintiff will fairly and adequately represent the interests of the stockholders in enforcing the rights of the corporation.  Plaintiff is a citizen of South Carolina.

20.     Nominal Defendant Longfin is incorporated in Delaware and maintains its principal executive offices at 16-017, 85 Broad Street, New York, New York 10004.  Longfin is a citizen of New York and Delaware.

21.     Defendant Meenavalli has been the Company's Chief Executive Officer ("CEO") and Chairman of the Board at all relevant times.  Meenavalli has consistently controlled well over 50% of Longfin's voting equity.  Meenavalli founded Stampede Capital Limited ("Stampede Capital") and he and his wife currently own approximately 17% of its voting stock.  Stampede Capital, in turn, owns approximately 27.6% of Longfin's voting equity.  Upon information and belief, Meenavalli is a citizen of New Jersey.

22.     Defendant Vivek Kumar Ratakonda ("Ratakonda") was Longfin's Chief Operating Officer until or about December 11, 2017, when Longfin accepted the resignation of its prior Chief Financial Officer ("CFO") and appointed Ratakonda as the Company's new CFO. Ratakonda has served as the Company's CFO at all relevant times.    The same day as his appointment as CFO, Ratakonda executed a waiver approving the Company's purchase of Ziddu.com.  Ratakonda was a director of Stampede Capital from 2012 until February 2018.  Upon information and belief, Ratakonda is a citizen of New York.

23.     Defendant Altahawi is the president and majority owner of Adamson Brothers Corp.  Altahawi, through Adamson Brothers Corp., operates ipoflow.com which claims to be a "pioneer in Regulation A+ offerings" and a "leading equity Reg A+ offering platform opening up the IPO access to everyone."  Adamson Brothers Corp. is an alter ego of Altahawi's which he uses to serve as an unregistered broker-dealer purportedly specializing in Regulation A offerings. Altahawi has been employed with various registered broker-dealers.  Altahawi became Longfin's Secretary in June 2017 and continued, whether officially or unofficially, until at least late-December 2017.  Upon information and belief, Altahawi is a citizen of Florida.

24.     Defendant Yogesh Patel ("Patel") is a member of the Board and the Company's Global Head Officer and Secretary.  Upon information and belief, Patel is a citizen of New Jersey.

25.     Defendant Linga Murthy Gaddi ("Gaddi") is a member of the Board and the Company's Chief Technical Officer.  Upon information and belief, Gaddi is a citizen of New York.

26.     Defendant Ghanshyam Dass ("Dass") is a member of the Board.    Upon information and belief, Dass is a citizen of California.

27.     Defendant David Nichols ("Nichols") is a member of the Board.    Upon information and belief, Nichols is a citizen of New York.

28.     Defendant John Parker ("Parker") is a member of the Board.  Upon information and belief, Parker is a citizen of New York.

29.     Defendants Meenavalli, Ratakonda, Altahawi, Patel, Dass, Gaddi, Nichols, and Parker are referred to as the "Individual Defendants."  Defendants Meenavalli, Ratakonda, Patel, Dass, Gaddi, Nichols, and Parker are referred to as the "Director Defendants."

## DUTIES OF DEFENDANTS

30.     Defendants owed Longfin and its investors the fiduciary obligations of trust, loyalty, and good faith because of their ability to control the business and corporate affairs of Longfin.  The Individual Defendants were obligated to manage Longfin in an honest and lawful manner and to further the best interests of Longfin and its investors.

31.     To discharge their duties, the officers and directors of Longfin were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  Specifically, the officers and directors of Longfin were required to, *inter alia*:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of

financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)      remain informed as to how Longfin conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

32.      Moreover, the Board's "Role in Risk Oversight" was outlined in the Company's 2017 10-K, filed with the SEC on April 2, 2018:

> Our board of directors is generally responsible for the oversight of corporate risk in its review and deliberations relating to our activities. Our principal source of risk falls into two categories, financial and product commercialization. The audit committee will oversee management of financial risks; our board of directors regularly reviews information regarding our cash position, liquidity and operations, as well as the risks associated with each. The board of directors regularly reviews plans, results and potential risks related to our product development, commercialization efforts and clinical trial progress. Our Compensation Committee is expected to oversee risk management as it relates to our compensation plans, policies and practices for all employees including executives and directors, particularly whether our compensation programs may create incentives for our employees to take excessive or inappropriate risks which could have a material adverse effect on the Company.

33.      The 2017 10-K also discusses the role of the Board's Audit Committee:

> Our audit committee is responsible for, among other things:

- •      appointing, compensating, retaining, and overseeing our independent registered public accounting firm;

- •      approving the audit and non-audit services to be performed by our independent registered public accounting firm;

- reviewing, with our independent registered public accounting firm, all critical accounting policies and procedures;

- reviewing with management the adequacy and effectiveness of our internal control structure and procedures for financial reports;

- reviewing and discussing with management and our independent registered public accounting firm our annual audited financial statements and any certification, report, opinion or review rendered by our independent registered public accounting firm;

- reviewing and investigating conduct alleged to be in violation of our code of conduct;

- reviewing and approving related party transactions;

- preparing the audit committee report required in our annual proxy statement; and

- reviewing and evaluating, at least annually, its own performance and the adequacy of the committee charter.

34.    The Individual Defendants failed to maintain their self-imposed standards as well as those prescribed by law, which resulted in the breaches of fiduciary duty described herein.

## SUBSTANTIVE ALLEGATIONS

35.    Longfin is a finance and technology company that purports to specialize in structured trade finance and physical commodities finance solutions.  The Company also claims to provide blockchain technology solutions for a variety of businesses.

36.    The Company was incorporated in Delaware on February 1, 2017.  On that same day, the Board decided to pursue a Regulation A offering.  The Company subsequently submitted Forms 1-A and 1-A/A with the SEC, seeking Regulation A qualification, and on June 16, 2017, the SEC notified Longfin that it was qualified to issue up to 10 million shares of Class A common stock at a price of $5 per share.

37.    In late June 2017, Defendant Meenavalli received an executed engagement letter from Network 1 Financial Securities Inc. ("Network 1"), which outlined certain terms of their

engagement as the proposed lead underwriter for Longfin's Regulation A Offering. Altahawi has a close relationship with Network 1, as he was registered as a broker-dealer in Network 1's Red Bank Office from 2014–2015.

38.     Over the following months, Longfin issued numerous Amendments to its Post-Qualification Offering Circular (the "POS"). On August 31, 2017, Longfin filed its fourth Amendment to the POS (the "POS 4") containing the Company's Underwriting Agreement with Network 1, dated August 21, 2017. Network 1 was subsequently officially retained as lead underwriter for the Regulation A Offering.

39.     On September 1, 2017, Longfin issued 31,775 shares to thirty-six individuals purportedly using its Regulation A exemption. At the time, Meenavalli informed the Company's transfer agent that all of these individuals were "all employees."

40.     From September 1, 2017, through December 6, 2017, Longfin's control log shows that the company issued a total of 67,725 Class A Stock to 261 individual purchasers. Over the following months, Longfin issued numerous Amendments to its POS.

41.     On September 15, 2017, Altahawi, as corporate Secretary for the Company and a "member of Longfin's board of advisors," signed a Certificate of Corporate Resolution granting the Company's former CFO 3,375,000 shares of Longfin's Class A Stock. The Certificate also granted Altahawi 2,025,000 shares of Longfin Class A Stock, purportedly in consideration of legal and business consulting services he performed for the Company (the "Consulting Shares"). The Consulting Shares were restricted securities that could not be resold, except under limited circumstances.

42.     Longfin submitted its initial application for listing on NASDAQ on August 11, 2017.  Altahawi and Network 1, following its retention on August 21, 2017, were primarily responsible for communicating with NASDAQ regarding Longfin's application for listing.

43.     NASDAQ Listing Rule 5505(a) requires that a Company seeking to list its equity securities have, *inter alia*, at least 1,000,000 publicly-held shares and at least 300 round lot holders, and a market value of the publicly-held shares of at least $5 million.

44.     NASDAQ Listing Rules 5005(a) defines "Publicly Held Shares" as "shares not held directly or indirectly by an officer, director or any person who is the beneficial owner of more than 10 percent of the total shares outstanding.  Determinations of beneficial ownership in calculating publicly held shares shall be made in accordance with Rule 13d-3 under the Act"; and a "Round Lot Holder" as "a holder of a Normal Unit of Trading [100 shares]" but that the "number of beneficial holders will be considered in addition to holders of record."

45.     The Company, at the behest of the Individual Defendants, acknowledged the foregoing requirements in various amendments to its POS.  For example, the POS 9 stated:

> We anticipate the shares of our common stock will be listed on the Nasdaq Capital Market (under Net Income Standard) under the symbol "LFIN". In order to list, the Nasdaq Capital Market requires that, among other criteria, at least 1,000,000 publicly-held shares of our common stock be outstanding, the shares be held in the aggregate by at least 300 round lot holders, the market value of the publicly-held shares of our common stock be at least $5 million, our stockholders' equity after giving effect to the sale of our shares in this offering be at least $4 million, the bid price per share of our common stock be $4.00 or more, and there be at least three registered and active market makers for our common stock.

46.     On November 3, 2017, Longfin's ninth – and final – amendment to the POS was filed (the "POS 9").  The POS 9 received qualification from the SEC on November 22, 2017 and qualified Longfin to conduct a Regulation A Tier 2 offering of up to 10 million Class A Shares for $5.00 per share with a minimum purchase amount of 100 shares.

47.     On November 15, 2017, NASDAQ informed the Company that, based on the information it had provided and filings with the SEC, Longfin's listing was approved, but the Company was still required to disclose any material changes in circumstance that could impact its eligibility for listing on NASDAQ.

48.     On November 29, 2017, Altahawi sent an email, copying Meenavalli, to NASDAQ informing them that Longfin intended to close its offering on December 6, 2017, and list its Class A Stock on December 11, 2017.

49.     On December 4, 2017, Network 1 emailed Altahawi and the Company's transfer agent and requested updated information on issuances under the Regulation A Offerings for its communications with NASDAQ regarding Longfin's proposed listing on December 11, 2017. Shortly thereafter, as instructed by Altahawi, the transfer agent provided Network 1 with a list of issuances made under the Regulation A Offering and a reconciliation printout which detailed the deposits received for such purchases along with their remittances.

50.     By December 6, 2017, substantially less than 1 million shares of Longfin's Class A Stock were publicly held, and the Company consequently failed to meet NASDAQ's listing requirements.

51.     Rather than delay the Company's application for listing, on December 6, 2017, Meenavalli and Altahawi caused Longfin to issue 409,360 new Class A shares (the "December 6 Shares") to twenty-four individuals (the "December 6 Stockholders"), outside of Longfin's Regulation A offering, for $0 in consideration.

52.     More specifically, at 3:19 p.m. on December 6, 2017, Altahawi emailed Longfin's escrow agent once again copying Meenavalli, to request a phone call and stated, "I need to submit 24 subscriptions we need to issue the shares for as of today please."  By 4:09 p.m., Altahawi

provided subscription agreements for each of the 24 December 6 Stockholders to the escrow agent. Just two hours later, at 6:30 p.m. the transfer agent informed Altahawi and Meenavalli that the issuances were complete.  Shortly thereafter, at 7:40 p.m., Altahawi informed NASDAQ that the Company would close the offering on December 7, 2017, and requested that the Company's Class A Stock be listed on December 13, 2017.

53.     In a period of less than four hours, Altahawi and Meenavalli caused Longfin to issue the 409,360 non-exempt restricted Class A Shares, for free, to twenty-four Longfin-affiliated individuals, including:

- Defendant Ratakonda:  Longfin's CFO;

- Two of Ratakonda's family members;

- Gaddi Linga Murthy:  Longfin's Chief Technology Officer;

- Emmanuel Dasi:  Longfin's Chief Information Officer and Stampede Capital Limited's former CIO;

- Prathipati Parthasarathi ("Parthasarathi"):  Stampede Capital Limited's former CFO and Executive Director;

- Karimgam Avinash:  Stampede Capital Limited's former Executive Director;

- Satya Srikanth Karaturi:  Director of Spacenet Enterprises India Limited, Kling Enterprises India Limited, and Stampede Enterprises India Private Limited; and

- Vasudeva Rao Maraka:  Director of Operations for Meridian Tech Pte. Ltd.

54.     None of the December 6 Shares were issued pursuant to the Regulation A Offering and the Company's escrow agent received no consideration in exchange for these 409,360 Class A Shares.  Nevertheless, such shares would not have been deemed "publicly held" for NASDAQ's listing requirements.

55.     On December 7, 2017, Altahawi sent an email to Network 1 attaching the updated stockholders list including the December 6 Stockholders and stated, "Let's close on the offering later today to issue the remaining shares and break escrow tomorrow."  Shortly thereafter, Network 1 requested that Altahawi confirm "the list of people that invested in the raise before our deal and proof of Funds received."  In response, Altahawi forwarded Network 1 an email listing the 24 individual December 6 Stockholders and provided bank statements purporting to contain payment information.

56.     None of the December 6 Stockholders paid for these shares and the bank statements therefore did not actually constitute "proof of Funds received."  Accordingly, Network 1 knew, or was reckless in not knowing, that the December 6 Shares were not lawfully issued.  Moreover, the list of names included individuals Network 1 must have known were affiliated with the Company – such as Defendant Ratakonda – and thus could not be deemed to have shares that were "publicly held" for purposes of NASDAQ's listing requirements.

57.     On December 11, 2017, Altahawi presented NASDAQ with a final list of stockholders and informed them – falsely – that the Company had sold 1,140,989 Class A shares under its Regulation A Offering between September 1, 2017 and December 11, 2017, and there were 364 stockholders in total.

58.     In addition, on or about December 11, 2017, the Board accepted the resignation of Krishanu Singhal as CFO and Raj Mondraty as COO effective December 11, 2017, and the Board then appointed defendant Ratakonda as CFO, effective immediately.  However, in contravention of its duties to inform NASDAQ of these material changes, Defendants did not disclose the resignations to the public or to NASDAQ at any time before December 15, 2017.

59.     On December 13, 2017, Longfin's Class A Shares were officially listed on NASDAQ under the ticker symbol "LFIN."  In connection with its voluntary NASDAQ listing, Longfin was required to comply with the filing requirements of Section 12(b) of the Exchange Act.  Specifically, the Company was required to file, on or before January 8, 2018, a quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2017.  However, Longfin's Form 10-Q remained delinquent from January 9, 2018, until May 4, 2018.

60.     On or about December 21, 2017, Network 1 received requests from seven of the December 6 Stockholders – including Tammineedi and Penumarthi – to open brokerage accounts. In response, it contacted Altahawi to confirm that these stockholders had paid for their shares. Altahawi again provided bank statements purporting to show their purchases.  Network 1 knew these shares had not been paid for but opted to turn a blind eye in favor of receiving its commissions and compensation on the offering.  As set forth in the SEC complaint, the two escrow accounts used in connection with the Regulation A Offering and Longfin's PNC Bank account contained "no evidence of payments for the shares issued on December 6, 2017, or around the time that subscription agreements were signed by the December 6 Stockholders."[2]

61.     On January 12, 2018, Altahawi entered into a share purchase agreement to purchase 121,000 Class A shares from ten of the December 6 Stockholders, including two of Ratakonda's family members and Tammineedi, for $30.00 per share (the "Private Transaction").  Each of the 10 individual December 6 Stockholders' signatures were on the same agreement.  Given that these stockholders were located in disparate areas, the transfer agent contacted Meenavalli to confirm whether they should conduct the transfer.  Meenavalli approved the transfer.

---

[2] *SEC v. Longfin Corp., et al.*, No. 1:18-cv-2977-DLC, Dkt. No. 43-1, ¶ 44.

62.     The December 6 Shares were not issued pursuant to the Regulation A Offering because they were issued for a price other than $5 per share (and indeed, were issued for $0 per share).   Accordingly, the shares acquired in the Private Transaction were not exempted from registration requirements and could not be legally sold on the open market.

63.     As noted, Altahawi managed Longfin's Regulation A Offering as part of his duties under the Consulting Agreement he entered into with Longfin on February 1, 2017.   The Consulting Shares bore a restrictive legend which would not be lifted until one year following the date on which the shares were fully earned/issued – that is, one year from June 2017 if Altahawi's performance was contingent upon the Company attaining its first qualification, or one year from December 2017 if his performance was based on the close of the Regulation A Offering.   Thus, the earliest date upon which the restriction could have been properly lifted would have been June 2018.

64.     Between late February 2018 and early March, Altahawi tried to deposit the Consulting Shares in his personal brokerage account, but the deposit was declined due to the restrictive legend.

65.     Accordingly, Meenavalli, on behalf of Altahawi, contacted the Company's transfer agent and requested that they remove the restrictive legend from the Consulting Shares because Altahawi had purportedly fully earned the shares as of February 2017 and a full year had passed. At Meenavalli's instruction, the transfer agent removed the restrictive legend from the Consulting Shares.   Following the removal of the restrictive legend, Altahawi controlled over 60% of the public float.

66.     Between February 8, 2018 and March 29, 2018, Altahawi sold 536,103 Longfin shares on the open market and received a profit of approximately $29,016,156.34.   Altahawi's

sales were not exempt from registration and no registration statement was filed or in effect for the sales, and no exemption under the Securities Act of 1933 (the "Securities Act") applied to the sales.[3]  Accordingly, the sales were made in direct violation of Section 5 of the Securities Act.

67.     In the process of selling the December 6 Shares acquired through the Private Transaction and portions of his Consulting Shares, Altahawi engaged in dozens of wash trades designed to simulate market activity by raising Longfin's trading volume to artificially inflate and/or prop up its trading price.  For example, the following screenshot of Altahawi's brokerage account exhibits clear manipulative trading patterns by way of wash trades:

| LFIN | 2018-03-22, 10:44:07 | 54 | 58.4000 | 64.5000 | -3,153.60 | -1.00 | 3,154.60 | 0.00 | 329.40 |
|------|------|------|------|------|------|------|------|------|------|
| LFIN | 2018-03-22, 10:44:12 | -54 | 58.5500 | 64.5000 | 3,161.70 | -1.08 | -2,305.80 | 854.82 | -321.30 |
| LFIN | 2018-03-22, 10:44:39 | -51 | 58.7000 | 64.5000 | 2,993.70 | -1.08 | -2,177.70 | 814.92 | -295.80 |
| LFIN | 2018-03-22, 10:52:36 | 51 | 58.5500 | 64.5000 | -2,986.05 | -1.00 | 2,987.05 | 0.00 | 303.45 |
| LFIN | 2018-03-22, 10:52:46 | 54 | 58.4000 | 64.5000 | -3,153.60 | -1.00 | 3,154.60 | 0.00 | 329.40 |
| LFIN | 2018-03-22, 10:54:48 | -54 | 58.5500 | 64.5000 | 3,161.70 | -1.08 | -2,305.80 | 854.82 | -321.30 |
| LFIN | 2018-03-22, 10:56:12 | -51 | 58.7000 | 64.5000 | 2,993.70 | -1.08 | -2,177.70 | 814.92 | -295.80 |
| LFIN | 2018-03-22, 11:14:55 | 51 | 58.5500 | 64.5000 | -2,986.05 | -1.00 | 2,987.05 | 0.00 | 303.45 |
| LFIN | 2018-03-22, 11:16:10 | 54 | 58.4000 | 64.5000 | -3,153.60 | -1.00 | 3,154.60 | 0.00 | 329.40 |
| LFIN | 2018-03-22, 11:18:42 | -54 | 58.5500 | 64.5000 | 3,161.70 | -1.08 | -2,305.80 | 854.82 | -321.30 |
| LFIN | 2018-03-22, 11:20:01 | 54 | 58.4000 | 64.5000 | -3,153.60 | -1.00 | 3,154.60 | 0.00 | 329.40 |
| LFIN | 2018-03-22, 11:20:08 | -54 | 58.5500 | 64.5000 | 3,161.70 | -1.08 | -2,305.80 | 854.82 | -321.30 |

68.     Altahawi engaged in dozens of these trades, which subjects him to additional liability for actively manipulating Longfin's trading price.

---

[3]  *SEC v. Longfin Corp., et al.*, 18-cv-02977-DLC, Dkt. No. 67, ¶ 11.

69.     Additionally, Altahawi sold these shares while in possession of material non-public information and had a duty to disclose the truth of the material non-public information or abstain from trading. The material non-public information he possessed included the facts that: (i) Longfin was not headquartered in New York; (ii) Longfin's Regulation A offering was a sham, and none of the shares it issued were actually issued pursuant to the Regulation A offering, but instead were issued for $0 per share in consideration to insiders and their affiliates; (iii) Longfin was not qualified for listing on NASDAQ, and had obtained such listing under false and fraudulent pretenses; (iv) Ziddu.com was a worthless shell that had no valuable expertise, operations, or ongoing business associated with blockchain technology; (v) Longfin had material weaknesses in its operations and internal controls over financial reporting; (vi) Longfin's purported public float was severely inflated by the unregistered, non-exempt Class A Stock Defendants illegally introduced into the public market and numerous Class A Shares held by Defendants' affiliates; and (vii) Longfin suffered financial losses which imperiled its ability to continue as a going concern.

70.     Tammineedi was one of the December 6 Stockholders. As part of the issuance, he received 30,000 shares from the Company at no cost.  These shares were not issued under the Regulation A Offering.

71.     Between February and March 2018, Tammineedi sold 2,200 of the 30,000 Class A Shares he received as part of the December 6 issuance. These sales were made on the open market and yielded a profit of $127,335 for Tammineedi.

72.     Tammineedi sold these shares while in possession of material non-public information and had a duty to disclose the truth of the material non-public information or abstain from trading.  The material non-public information he possessed included the facts that:

(i) Longfin's Regulation A offering was a sham, and none of the shares it issued were actually issued pursuant to the Regulation A offering, but instead were issued for $0 per share in consideration to insiders and their affiliates; (ii) Longfin was not qualified for listing on NASDAQ, and had obtained such listing under false and fraudulent pretenses; (iii) Ziddu.com was a worthless shell that had no valuable expertise, operations, or ongoing business associated with blockchain technology; (iv) Longfin had material weaknesses in its operations and internal controls over financial reporting; (v) Longfin's purported public float was severely inflated by the unregistered non-exempt stock Defendants illegally introduced into the public market and numerous shares held by Defendants' affiliates; and (vi) Longfin suffered financial losses which imperiled its ability to continue as a going concern.

73.     Tammineedi's sales were not exempt from registration and in direct violation of Section 5 of the Securities Act.

74.     Penumarthi received 40,000 Class A Shares in connection with the December 6 issuance.  These shares were issued for $0, and thus not issued under the Regulation A Offering.

75.     On January 23, 2018, Penumarthi sold 4,000 of the December 6 Shares for a Profit of approximately $169,495.  Shortly thereafter, Penumarthi sold 35,800 of the shares for a profit of approximately $1,361,692.39.  Penumarthi retained the remaining 200 shares he received on December 6, 2017.

76.     Penumarthi's sales were not exempt from registration and in direct violation of Section 5 of the Securities Act.  Penumarthi sold these shares while in possession of material non-public information and had a duty to disclose the truth of the material non-public information, of abstain from trading.

77.     On December 13 and 14, 2017, Defendant Tammineedi, through his company Source Media, purchased 67,000 shares of Longfin for an average of $5.48 per share on the open market.  As detailed herein, within days of Longfin's listing, its price skyrocketed as a result of Longfin's false and misleading statements regarding a purported blockchain related asset. Tammineedi sold these shares for approximately $2.7 million in profits and executed most of these shares within days of the Ziddu.com Announcement (defined below).  Tammineedi copied Meenavalli on his emails regarding the brokerage account he opened and used to deposit Longfin shares and execute these transactions.  Tammineedi's purchases and sales were undoubtedly executed on the basis of inside information.

## THE INDIVIDUAL DEFENDANTS'
## MATERIAL MISSTATEMENTS AND OMISSIONS

78.     On December 11, 2017, prior to the listing of the Company's Class A Stock on NASDAQ, the Company's directors accepted the resignation of its former CFO and COO and appointed Ratakonda as CFO.  In addition, the members of the Board, including Defendant Ratakonda, approved the Company's acquisition of Ziddu.com from Meridian Enterprises for 2.5 million Longfin Class A Shares.  Upon information and belief, Defendant Meenavalli owned approximately 92% of Meridian Enterprises at the time of this transaction.[4]

79.     On December 13, 2017, the Company's Class A Stock opened at a price of $6.94 per share and closed at $5.17 per share.  That same day, the Company issued a press release stating in relevant part:

New York, Dec. 13, 2017 (GLOBE NEWSWIRE) -- Longfin Corp.   (NASDAQ:

---

[4]  On July 27, 2018, Defendant Meenavalli filed a Form 4 with the SEC reporting:  (a) he had a 97.58% ownership interest in Meridian Enterprises when the Ziddu.com acquisition occurred; (b) following the Ziddu.com acquisition, through his ownership in Meridian Enterprises, he had a pecuniary interest in 2,097,970 Class A Shares; and (c) that on July 23, 2018 and July 25, 2018, he sold approximately 92.67% of that interest (carrying a pecuniary interest in 965,515 Class A Shares) in exchange for $5,900,608.  This is was the first Form 4 ever filed for the Company on the SEC's Edgar Database.

LFIN), a leading global FinTech company, announces that it will be traded on the Nasdaq market for the first day after its initial public offering (IPO) under Reg A+ closing on December 8, 2017.  "We are delighted to be the first FinTech company went public through Reg A+ on the Nasdaq market," commented Mr. Meenavalli, Chairman and CEO of Longfin.

"We acknowledged the Nasdaq and the Jumpstart Our Business Startups (JOBS) Act for providing micro-cap companies, like us, with great opportunities to raise capital from the market. We will use the capital we raised during IPO to execute our growth agenda so that we can maximize the stockholder value."

*     *     *

About Longfin Corp.

Longfin ("LFIN") is a US-based, global FinTech company powered by Artificial Intelligence (AI) and Machine Learning. The company, through its wholly-owned subsidiary, Stampede Tradex Pte. Ltd., delivers foreign exchange and finance solutions to importers/exporters and SMEs. Currently, Longfin has operations in London, Singapore, Dubai, New York, Miami and India.

80.    On December 13, 2017, the Company issued another press release that stated in

relevant part:

NEW YORK, Dec. 13, 2017 (GLOBE NEWSWIRE) -- Longfin Corp.   (Nasdaq:

LFIN), a leading global FinTech company powered by Artificial Intelligence (AI) and Machine Learning, visited the Nasdaq MarketSite in Times Square today in celebration of its initial public offering (IPO) on The Nasdaq Stock Market.

According to a research report of Asian Development Bank (ADB), in 2016, the global trade finance gap is $1.5 trillion. Access to finance is the biggest challenge to small and medium enterprises in developing countries and other frontier markets. Powered by Artificial Intelligence (AI) and Machine Learning, Longfin delivers foreign exchange and finance solutions to importers/exporters and SMEs. Its presence in the world's leading markets enables them to offer clients access to nuances of the local markets while providing gateway to the global markets.

"We are delighted to be the first FinTech company went public through Reg A+ on Nasdaq," commented Mr.  Meenavalli, Chairman and CEO of Longfin.   "We acknowledged Nasdaq and the Jumpstart Our Business Startups (JOBS) Act for providing micro-cap companies, such as ourselves, with great opportunities to raise capital from the market. We will use the capital we raised during IPO to execute our growth agenda so that we can maximize the stockholder value."

"India's innovation-driven growth has been unprecedented. Its economy boosts transformation within the country and contributes to global development." said Bob McCooey, Senior Vice President, Nasdaq. "As the 2nd IPO completed on Nasdaq

by an Indian company since 2010, Longfin embodies the can-do spirit like many entrepreneurs of Nasdaq listed companies. We are excited to partner with them as they continue to grow."

81.    The December 13, 2017 press releases were false and misleading because they concealed and omitted the material fact that the Company had obtained its NASDAQ listing under false and fraudulent pretense.  Specifically, (a) the Class A Stock failed to satisfy the listing requirements set forth in NASDAQ Listing Rule 5505(a); (b) the Company's entire Regulation A Offering was a sham; (c) all publicly held or traded Class A Stock had been issued in non-exempt transactions involving unregistered securities; (d) all publicly held or traded Class A Stock  had been sold to the public without properly observing the requirements of Regulation A; (e) a significant number of shares in the public float had been granted free of consideration to insiders, who were in turn selling such shares in the marketplace for their own benefit rather than that of the Company; and (e) Longfin was not a "US based, global fintech company powered by artificial intelligence (AI) and machine learning."

82.    Moreover, the December 13, 2017 press releases were false and misleading because, contrary to the representations made, the Company had only sham operations in New York.  As reported by in *The Wall Street Journal*, on April 3, 2018, the so-called "headquarters" in New York had space for just three individuals, was completely devoid of representatives, and lacked even basic office equipment.

83.    On December 14, 2017, the Company issued a press release entitled *Longfin Corp acquires Blockchain empowered Global Micro-lending solutions provider Ziddu.com* ("Ziddu.Com Announcements").  The press release stated in relevant part:

New York, NY (December 14, 2017) - Longfin Corp. (LFIN: Nasdaq) announces the acquisition of Ziddu.com, a Blockchain technology empowered solutions provider that offers Microfinance Lending against Collateralized Warehouse Receipts in the form of Warehouse Coins to small and medium enterprises (SMEs),

processors, manufacturers, importers and exporters using crypto currencies across continents.

Ziddu Warehouse Coin is a smart contract that enables Importers and Exporters to use their Ziddu coins that are loosely pegged to Ethereum and Bitcoin Crypto Currency. The Importers/Exporters convert offered Ziddu coins into Ethereum and Bitcoin Cryptocurrencies and use the proceeds for their working capital needs.

*    *    *

"The advent of Blockchain technology has caught the imagination of the global financial services industry; blockchain is emerging as a technological revolution that we believe is set to disrupt the financial services infrastructure. Crypto currencies such as Bitcoin and Ethereum are expected to act as a global financing currency to avail credit against hard currencies of many emerging markets." Says Venkat Meenavalli, Chairman of Longfin Corp.

Ziddu intends to use blockchain technology to transform the lives of millions of SME's by providing finance by way of Ziddu coins and through Crypto Currencies such as Ethereum and Bitcoin against their collateralized warehouse receipts. At the end of the contract, Importers/Exporters are expected to realize their proceeds and pay back their funds through Crypto Currencies only. Depending upon the risk profile of the counterparty, the interest will vary between 12% to 48%.

84.     The Ziddu.com Announcements misled stockholders into believing that the Company had acquired a valuable asset related to virtual currencies (referred to as cryptocurrencies) and that this asset had been operating as a provider of "Blockchain technology empowered solutions."  In fact, Ziddu.com was worthless and its acquisition was the byproduct of the scheme to artificially inflate the Class A Stock's trading price.

85.     The Ziddu.com Announcements were issued when trading prices for virtual currencies had reached record highs.  For example, the trading price of Bitcoin ("BTC") rose from approximately $900 per BTC in January 2017 to approximately $20,000 per BTC in December 2017, an increase of approximately 11,000%.

86.     The Ziddu.com Announcements also deceived the investing public with their description of the "Ziddu Warehouse Coin" (the "Ziddu Coin") which purportedly had a value "loosely pegged" to Bitcoin and Ethereum.  This representation misled investors into believing

that the value of Ziddu.com had some correlation to the value of BTC and Ethereum, both of which experienced exponential growth in recent months.  The Ziddu Coin has never had any value – let alone a value similar to BTC or Ethereum.

87.    As revealed in the Company's Form 10-K annual report filed on April 2, 2018 (the "2017 Form 10-K"), Ziddu.com had no revenue or value at the time of its acquisition.  In fact, the Company recorded Ziddu.com's value as $0 – a fact which would have been material to Company stockholders when the acquisition was announced.  However, such information was not revealed until the filing of the 2017 Form 10-K, which stated in relevant part:

> On December 11, 2017, the Company issued 2,500,000 shares of its Class A Common Stock in connection with the purchase of the website www.Ziddu.com and all of its respective content and intellectual property rights (the "Ziddu"), from Meridian Enterprises Pte. Ltd., ("Meridian") a company owned 92% by Mr. Meenavalli.  The acquisition of the Ziddu has been accounted for as an asset acquisition between entities under common control and was recorded at Meridian's historical carrying value of $0 (zero).  The website and related content and intellectual property comprised substantially all of the value acquired.  Meridian had not recognized revenue related to Ziddu historically.

88.    The Individual Defendants' representations relating to the Ziddu.com acquisition were false and/or misleading.

89.    In the days following issuance of the Ziddu.com Announcements, the Company's Class A Stock increased from $5.39 per share on December 14, 2017, to a high of $142.82 on December 18, 2017, representing an increase of more than 2,500% in just three trading days, due to the Company's false or misleading statements and omissions.  Shortly thereafter, the Company's Class A Stock declined, eventually falling 96.46% to an opening price of $5.05 on May 24, 2018 – the date on which the stock became a tradeable asset after the April 6, 2018 trading halt.

90.    On January 23, 2018, the Company issued a press release entitled *Multibillion Dollar Fund to Invest $52.7 million into Longfin Corp.* ("Fund Announcement").  This Company press release stated in relevant part:

New York, Jan. 23, 2018 (GLOBE NEWSWIRE) -- Longfin Corp. ("Longfin" or the "Company") (NASDAQ: LFIN) a leading global FinTech company, has announced that the Company has entered into a securities purchase agreement with a multibillion-dollar fund. The institutional investor is investing $52,700,000 through convertible note instruments (the "Notes"). A press release regarding the transaction was previously issued prior to finalization of the documentation earlier today, and the Company is confirming the transaction is proceeding on the terms indicated below.  Joseph Gunnar & Co., LLC is acting as placement agent.

*        *        *

**Key Transaction Details**

The Notes consist of (i) Series A Senior Convertible Notes in the aggregate principal amount of $10,095,941.18 and (ii) Series B Senior Secured Convertible Notes in the aggregate principal amount of $42,604,058.82.  The nature of the investment will involve (i) an upfront cash payment in the amount of $5,000,000, and (ii) secured promissory notes payable by the investors to the Company in the aggregate principal amount of $42,604,058.82 (referred to below as the "Investor Notes").  Under the Investor Notes, the Investors are required to prepay the Investor Notes to the Company in two equal installments following the registration of all of the shares underlying the Investor Notes and warrants issued together with the Investor Notes.

Longfin is one of the few players in the global FinTech space in alternative finance and shadow banking, a $72 trillion industry worldwide.

"To secure funding from this large institutional investor at current market valuation will enhance the visibility and revenue growth of the company in a rapid way.  We are confident in our goal of reaching a 250% revenue growth rate organically, and outnumbering our growth rate in 2017.  This funding will also help Longfin in its acquisition endeavors within the Blockchain powered Smart Contracts and FinTech space across the globe," stated Venkat S. Meenavalli, Chairman and CEO of Longfin Corp.

*        *        *

About Longfin Corp.

Longfin Corp (Nasdaq: LFIN) is a US-based, global fintech company powered by artificial intelligence (AI) and machine learning. The Company, through its wholly-owned subsidiary, Longfin Tradex Pte. Ltd, delivers FX and alternative finance solutions to importers/exporters and SME's. Ziddu.com owned by the company is the only market place for smart contracts powered by Consensus Settlement Algorithm on ethereum blockchain. Ziddu ethereum ERC20 blockchain Token uses a technology stack in which Smart Contracts run in distributed virtual machines, which in turn run on a Consensus Settlement Algorithm (CSA) providing solutions to warehouse / international trade financing, micro-lending, FX OTC derivatives,

26

bullion finance, and structured products. Currently the company has operations in Singapore, Dubai, New York and India.

91.     The Fund Announcement was false and misleading because, as revealed in the Amendment to the 2017 Form 10-K (the "2017 Form 10-K/A"), filed on April 19, 2018, it was unlikely that the Company "will be able to continue as a going concern unless a significant restructuring of [its] obligations is implemented, either by means of negotiation or through a bankruptcy proceeding."   Much like the Ziddu.com Announcement, the Fund Announcement referenced the fact that the Company's Class A Stock was traded on NASDAQ under the ticker symbol LFIN.   However, like the Ziddu.com Announcements, the Fund Announcement was misleading because it omitted the material fact that the Company had obtained its NASDAQ listing under false pretenses, and the Company's Class A Stock was actually ineligible for listing on NASDAQ.

92.     Furthermore, the Fund Announcement was false and misleading because it omitted that:   (a) the Company's Class A Stock was unregistered and had been sold to the public improperly and without properly observing the requirements of Regulation A; (b) a significant number of shares in the public float had been granted free of consideration to insiders, who were in turn selling such shares into the marketplace for their own benefit rather than that of the Company; and (c) the Company was not a "US-based, global fintech company powered by artificial intelligence (AI) and machine learning."

93.     Moreover, the Fund Announcement was false and misleading because it omitted material facts concerning the Company's business and operations, including the extent of the Company's capabilities at its New York offices and the identity and qualifications of key employees.   For example, the Company had only sham operations in New York.   In fact, as reported by in *The Wall Street Journal*, on April 3, 2018, the Company's "headquarters" in New

York had space for just three individuals, was completely devoid of representatives, and lacked even basic office equipment, such as computers.

94.     In short, the Company's representations regarding its business operations, headquarters in New York, and status as "one of the few players in the global FinTech space in alternative finance and shadow banking, a $72 trillion industry" were lies.  In fact, as with the Ziddu.com Announcements, the Company's solicitations have consisted of buzz words designed to distract and mislead stockholders into believing that it was actually a financial technology company involved in industries such as artificial intelligence or blockchain technology.

95.     On March 16, 2018, the Company was added to the Russell indices as part of Russell's quarterly addition of companies with recent initial public offerings. This addition significantly increased stockholder demand for the Company securities.

96.     On March 22, 2018, the Company issued a press release entitled *Longfin Corp.* Joins Russell 2000® Index and Russell 3000® Index (the "Russell Announcement"). The Russell Announcement stated in relevant part:

> Longfin Corp. ("Longfin" or the "Company") (LFIN), a global FinTech company, has announced that it has been added to the Russell 2000® Index and the Russell 3000® Index, effective March 16, 2018, as part of Russell's quarterly additions of companies with recent initial public offerings.
>
> Russell indices are widely used by investment managers and institutional investors for both index funds and as benchmarks for passive and active investment strategies in the U.S. marketplace. The Russell 3000® Index measures the performance of the largest 3,000 U.S. companies, representing approximately 98% of the investable U.S. equity market.
>
> The Russell 2000® Index measures performance of the small-cap segment of  the
>
> U.S. equity market and is a subset of the Russell 3000® Index.
>
> Venkat S. Meenavalli, Chairman and CEO of Longfin, says "We are pleased that Longfin is included in the Russell 2000® Index. We believe that this inclusion reflects the shareholder value we are building and will help increase Longfin's visibility within the investment community."

97.     The Russell Announcement was false and misleading because it omitted adverse

facts about the Company's business, operations, and compliance policies, specifically:  (i) the

Company had material weaknesses in its operations and internal controls over financial

reporting; (ii) the Company's purported public float – which Russell relied upon in determining

that the Company's Class A Stock would be listed in its indices – was severely inflated by the

unregistered Class A Shares Defendants illegally introduced into the public market through non-

exempt transactions and numerous shares held by Defendants' affiliates; and (iii) the Company

suffered financial losses which imperiled its ability to continue as a going concern.

98.     For example, contrary to Defendant Meenavalli's representations that the

Company's "inclusion [in on the indices] reflects the shareholder value we are building," the

Company was of little to no "value" to stockholders. In fact, once the Company's financial

statements had been audited, the Company's substantial financial losses were revealed and there

were "substantial doubts" that the Company would continue as a going concern:

> The continuation of the Company as a going concern is dependent upon the ability
> of the Company to obtain the monies from the Financing and the attainment of
> profitable operations. These factors, which are not within the Company's control,
> raise substantial doubt regarding the Company's ability to continue as a going
> concern. Although it is actively working on obtaining the additional funding
> pursuant to the Financing, the Company cannot make any assurances that the
> additional monies will be available to it and, if available, on a timely basis. If the
> Company is unable to obtain the monies from the Financing, it would negatively
> impact its business and operations and could also lead to the reduction or
> suspension of the Company's operations and ultimately force the Company to cease
> operations. These financial statements do not include any adjustments to the
> recoverability and classification of recorded asset amounts and classification of
> liabilities that might be necessary should the Company be unable to continue as a
> going concern.

99.     Moreover, the statements contained in the Russell Announcement were false

because they omitted material facts that:  (i) the Company's Class A Stock was unregistered and

had been sold to the public improperly and without observing the requirements of Regulation A

(ii) a significant number of shares in the public float had been granted free of consideration to insiders, who were in turn selling such shares in the marketplace for their own benefit rather than that of the Company; (iii) the Company's Class A Stock was not qualified for trading on NASDAQ nor for inclusion in any Russell index; and (iv) neither Longfin nor Ziddu.com had any operations concerning, prior experience in, or involvement with blockchain technology.

## THE TRUTH EMERGES

100.    On March 26, 2018, *Citron* reported: "If you are fortunate enough to get a borrow, indeed $LFIN is a pure stock scheme. @sec_enforcement should not be far behind. Filings and press releases are riddled with inaccuracies and fraud."

101.    The same day, Russell issued a statement entitled *Longfin Corp (USA): Constituent Deletion Changes in Russel Global Index Series*, stating in relevant part:

> Longfin (USA, constituent) was included as an IPO in the Russell 2000 index at the March quarterly update on the basis of its IPO filing of 3 November 2017 which stated that up to 10,000,000 Class A common shares would be offered. Subsequently, an SEC filing published on 13 February 2018, immediately prior to the Russell US Index rank date of 14 February 2018 for the quarterly IPO additions, confirmed that up to a maximum of 1,140,000 of the shares offered had been taken up by the public. Consequently, FTSE Russell has determined that Longfin failed to meet the minimum 5% free float requirement as at the 14 February rank date. In accordance with the FTSE Russell Recalculation Policy and Guidelines, Longfin will therefore be removed from the Russell Indexes on 28 March 2018 (after the close).

102.    On this news, the Company's Class A Stock declined precipitously.

103.    On March 27, 2018, *CNBC* published an article entitled *Longfin loses more than a third of its value after the controversial cryptocurrency stock is booted from the Russell 2000 index*. Defendant Meenavalli stated in relevant part:

> "We are reapplying" for inclusion in the indexes, Longfin CEO Venkat Meenavalli told CNBC in a phone interview Tuesday. He said the stock's free float has increased above the minimum 5 percent as of March 11 due to the expiration of a lockup period on a consultant's stock holdings. As for Citron's negative view, "we

are going to take legal action after we file the 10-K" in the next three days, Meenavalli said. "The company is a profitable company, making revenue."

104.    On this news, the trading price of the Company's Class A Stock declined from$34.68 per share on March 27, 2018 to close at $17.26 per share on March 29, 2018, a decline of more than 50%.

105.    Meenavalli's statement in response to revelations of Longfin's prior manipulative conduct was itself materially false and misleading at the time it was made, because the "expiration of the lockup period on a consultant's" shares was actually a reference to Altahawi's Consultant Shares and Altahawi had at all relevant times been a Longfin affiliate. Accordingly, the additional 2 million shares released into the market actually served to decrease the free float. Additionally, the "lockup period" had not expired, rather the Consultant Shares' restrictive legend was improperly and prematurely removed because Meenavalli personally directed the Company's transfer agent to do so. Moreover, as detailed *supra*, Altahawi's sales of such shares were unregistered non-exempt transactions in violation of the federal securities laws.

106.    Additionally, Meenavalli's statements on March 27, 2018 were materially false and misleading because:  (i) Citron's statements were substantially correct in that once the Company was finally audited, it was determined to be unlikely that the Company would "be able to continue as a going concern unless a significant restructuring of [its] obligations [were] implemented, either by means of negotiation or through a bankruptcy proceeding."; and (ii) Longfin was fully aware that its fraudulent conduct had begun unravelling and its threats of legal action against Citron were empty and meant to obscure the reality that that Citron's allegations were largely correct. Longfin was not a profitable company at any time, and the Company was actually on the verge of receiving a going concern qualification from its auditors.  On April 2, 2018, the Company filed its 2017 Form 10-K, revealing that the Company had material weakness in its internal control over financial

reporting and was the subject of an SEC investigation concerning its initial public offering and acquisition of Ziddu.com; and may not be able to continue as a going concern.  The 2017 Form 10-K stated in relevant part:

> We have identified several material weaknesses in our internal control over financial reporting. If our planned remediation of these material weaknesses is not effective, or if we experience additional material weaknesses in the future or otherwise fail to maintain an effective system of internal control over financial reporting in the future, we may not be able to accurately or timely report our financial condition or results of operations, which may adversely affect investor confidence in us and, as a result, the value of our securities.

> In connection with the audit of our financial statements beginning on page F-1, the Company identified several material weaknesses in its internal control over financial reporting. A material weakness is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's financial statements will not be prevented or detected on a timely basis. Below are the material weaknesses identified:

> (a)    the Company lacks qualified personnel who fully understand GAAP reporting requirements, possess appropriate skills to identify and determine proper accounting for new, complex or unusual transactions or have a proficiency in the SEC reporting environment;

> (b)    the Company did not maintain sufficient personnel with the technical knowledge and skills to perform accounting functions for complex/nonrecurring transactions and financial reporting functions;

> (c)    the Company exhibited an overall lack of sufficient knowledge, organized and sufficient audit support, documented positions and assessments, and policies/procedures related to the accounting treatment for both complex and non-complex transactions;

> (d)    certain segregation of duties issues exist (i.e., the same person performs the process and the control in certain areas);

> (e)    the Company does not have any formal or documented accounting policies and procedures, including with respect to intangible assets and monitoring related parties;

> (f)    senior financial reporting personnel have the ability to make journal entries; and

> (g)    there is no formal review process around journal entries recorded. Neither we nor our independent registered public accounting firm has performed an

evaluation of our internal control over financial reporting in accordance with Section 404 of the Sarbanes-Oxley Act. In light of the material weaknesses that were identified, we believe that it is possible that additional material weaknesses and control deficiencies may have been identified if such an evaluation had been performed.

The Company is working to remediate the material weaknesses, has taken steps to enhance the internal control environment, and plans to take additional steps to remediate the material weaknesses. Specifically, we will:

(h)     seek technically competent staff with appropriate experience applying GAAP accounting guidance and are currently utilizing a consultant with US GAAP/SEC experience to assist with financial reporting requirements;

(i)     design additional controls around identification, documentation and application of technical accounting guidance; implement additional internal reporting procedures, including those designed to add depth to the review processes and improve segregation of duties; and

(j)     restructur[e] internal controls to eliminate or improve known control issues.

The actions that we are taking are subject to ongoing senior management review as well as audit committee oversight. Although we plan to complete this remediation process as quickly as possible, we cannot at this time estimate how long it will take, and our efforts may not be successful in remediating these material weaknesses. In addition, we will incur additional costs in improving our internal control over financial reporting. If we are unable to successfully remediate these material weaknesses or if we identify additional material weaknesses, we may not detect errors on a timely basis. This could harm our operating results, cause us to fail to meet our SEC reporting obligations or NASDAQ Capital Market listing requirements on a timely basis, adversely affect our reputation, cause our stock price to decline or result in inaccurate financial reporting or material misstatements in our annual or interim financial statements.

In addition to the remediation efforts related to the material weaknesses described above, we are in the process of designing and implementing the internal control over financial reporting required to comply with Section 404 of the Sarbanes Oxley Act. This process will be time consuming, costly and complicated.

If during the evaluation and testing process, we identify one or more other material weaknesses in our internal control over financial reporting, our management will be unable to assert that our internal control over financial reporting is effective. Even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm may conclude that there are material weaknesses with respect to our internal controls or the level at which our internal controls are documented, designed, implemented or reviewed. If we are unable to assert that our internal control over financial reporting is

effective, or when required in the future, if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal control over financial reporting, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our securities could be adversely affected, and we could become subject to investigations by the stock exchange on which our securities are listed, the SEC, or other regulatory authorities, which could require additional financial and management resources.

*     *     *

**Going Concern**

The Company has limited operating history and experienced a net loss of $26.4 million since its inception. The Company has $2.1 million of cash at December 31, 2017. The Company operates primarily in structured trade finance and providing technology services and our operating costs are primarily related to the cost of providing those services, employee compensation and administrative expenses.

On January 22, 2018, pursuant to a Securities Purchase Agreement ("SPA") entered into by an institutional investor (the "Investor"), the Company agreed to sell and issue (1) (i) Senior Convertible Notes to the Investor in the aggregate principal amount of $52,700,000 (each, a "Note" and collectively, the "Notes"), consisting of a Series A Note in the principal amount of $10,095,941 and (ii) a Series B Note in the principal amount of $42,604,059, and (2) a warrant to purchase 751,894 shares of Longfin Class A Common Stock, exercisable for a period of five years at an exercise price of $38.55 per share (the "Warrant"), for consideration consisting of (i) a cash payment of $5,000,000, and (ii) a secured promissory note payable by the Investor to Longfin (the "Investor  Note") in the principal amount of $42,604,059 (collectively, the "Financing").  On February 13, 2018, the Company completed the Financing and related sale and issuance of the Notes, the Warrant and a placement agent warrant. The maturity date of the Notes is August 13, 2019 and the Investor Note is February 13, 2048. To date, the Company has received

$3.7 million in net proceeds ($5.0 million net of costs of $1.3 million) related to the Financing and will not be able to obtain additional monies through the Financing until the Company files a Registration Statement to register the common shares underlying the Notes and Warrant and such Registration Statement is declared effective by the Securities and Exchange Commission or such shares are eligible for resale pursuant to Rule 144 under the Securities Act, or the investor elects to convert or exercise such securities notwithstanding the underlying shares have not been so registered or are then so eligible.

The continuation of the Company as a going concern is dependent upon the ability of the Company to obtain the monies from the Financing and the attainment of profitable operations. These factors, which are not within the Company's control, raise substantial doubt regarding the Company's ability to continue as a going

concern. Although it is actively working on obtaining the additional funding pursuant to the Financing, the Company cannot make any assurances that the additional monies will be available to it and, if available, on a timely basis. If the Company is unable to obtain the monies from the Financing, it would negatively impact its business and operations and could also lead to the reduction or suspension of the Company's operations and ultimately force the Company to cease operations. These financial statements do not include any adjustments to the recoverability and classification of recorded asset amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

*      *      *

**Legal Matters**

The Company is and may become subject to certain legal proceedings and claims arising in connection with the normal course of its business. In the opinion of management, there are currently no claims that would have a material adverse effect on its consolidated financial position, results of operations or cash flows. On March 5, 2018, the Division of Enforcement of the SEC informed the Company that it is conducting an investigation In the Matter of Trading in the Securities of Longfin Corp. and requested that the Company provide certain documents in connection with its investigation, including documents related to our IPO and other financings and the acquisition of Ziddu.com. The Company is in the process of responding to this document request and will cooperate with the SEC in connection with its investigation. While the SEC is trying to determine whether there have been any violations of the federal securities laws, the investigation does not mean that the SEC has concluded that anyone has violated the law. Also, the investigation does not mean that the SEC has a negative opinion of any person, entity or security.

107.    On the same day, *The Wall Street Journal* reported that the Longfin had "failed to disclose important information and left a trail of misstatements behind," that led to the SEC's investigation. The article, entitled *Up- and- Down IPO Longfin Is Facing an SEC Probe*, revealed misrepresentations regarding the Company and its financial filings, including the identity of key employees, and the extent of operations at its downtown Manhattan principal offices. The article stated in relevant part:

> Longfin Corp. LFIN 3.82% took advantage of post-financial-crisis rules designed to create jobs and help young companies go public. But the financial-technology company, which was valued at $5.4 billion as recently as 10 days ago, is now under investigation by the Securities and Exchange Commission after it failed to disclose important information and left a trail of misstatements behind.

Since Longfin's December initial public offering, which raised $5.7 million – the company's price first rose 13-fold, then fell by 80%, all in less than four months. In the run-up to the IPO, the company, which says it operates computer platforms for trading on the Singapore and other stock exchanges, failed to disclose important information and misstated facts as basic as the age of its controlling shareholder, according to a review of securities filings.

On Monday, the company disclosed the SEC probe while also reporting material weaknesses in financial controls. The company, which said it is cooperating with the probe, said it may not be able to continue as a going concern.

The shares closed Monday down 17% at $14.31, above its IPO price of $5. Longfin went public using a provision of the Jumpstart Our Business Startups Act of 2012, known as Reg A+. The rules allow companies with less than $1 billion in annual sales to bypass some accounting and disclosure requirements imposed on bigger companies, but they do require accurate reporting.

The other nine Reg A+ IPOs that have listed on U.S. exchanges or been issued over the counter have lost more than half their value on average, Dealogic data show. Concerns about Longfin shine a light on the apparent ease with which IPOs are being approved under the Reg A+ regime, lawyers said. "Everyone understood we were rationalizing the disclosures [required] but nothing as flimsy as what appears to have happened here," said James Cox, a law professor at Duke University.

"We're going to look back on Reg A+ and think this was an experiment that didn't get managed very well."

The SEC gave Longfin the green light to sell shares based on one month's audited financial statements, which showed that 96% of the company's expenses were paid to a company controlled by Longfin's owner, Venkat Meenavalli, an Indian entrepreneur. The company also provided two years of audited statements for a Singaporean subsidiary, which generates most of its revenue. An SEC spokeswoman declined to comment.

Mr. Meenavalli, who says he controls 90% of Longfin shares, told *The Wall Street Journal* he is "based out of Dubai" but intends to spend 15 days a month in the U.S. He said its sole U.S. office space—a small room with three desks and no computers in a shared-office building in downtown Manhattan that was deserted at 9:30 on a recent weekday morning—is temporary. Longfin plans to open a bigger office in New York and is hiring more U.S. employees, he added.

Mr. Meenavalli rejects any suggestion of financial misconduct, saying short sellers, who have borrowed and sold short almost 15% of the shares available to trade, according to FactSet, are motivated by greed. "They enter into their own fire," he said.

A tiny portion of Longfin shares were sold in the Dec. 13 IPO. Two days later, Longfin disclosed that its chief financial officer and chief operating officer had

resigned just before the offering. But on the same day, the company said it had acquired a crypto company, Ziddu.com, from a company controlled by Mr. Meenavalli. Longfin shares rose more than 1,200% over the next two sessions to a peak value of $72.38.

Mr. Meenavalli is 48 years old, according to records he confirmed in an interview, although in a May 2017 SEC filing he is listed as 45. Described in that filing as "a financial wizard," his biographies for some earlier companies show him having a computer-science degree from Australia's Suffield University. His Longfin biography lists a diploma in international trade finance from Middlesex University in the U.K.

In SEC filings, Longfin reported it had 20 employees in March 2017. The number dropped to two the following month, rose to 15 in July, fell to three in November and was reported as 18 on Monday. A filing in July 2017 listed Sarah Altahawi, 23, as a New York-based executive. Ms. Altahawi said Monday she is not a company officer, "so that was a mistake."

Her father, Andy Altahawi, said she was a secretary. He was issued 2 million Longfin shares for advising on its IPO, according to filings. He said he "managed the SEC process as a consultant" and didn't act as a banker or underwriter. Mr. Altahawi was listed on Longfin's website as a director until September, when the SEC questioned why he wasn't included in the company's filings.

"I'm not a director . . . never was—what was online was untrue," he said. Mr. Meenavalli said Mr. Altahawi was an officer for two months but then resigned and declined an invitation to join the board.

At its peak value, Longfin was included for eight trading days in the Russell 2000 small-company stock index, which would draw in some of the $122 billion in funds that follow the index. Short-sellers said Russell made a mistake because just 1.5% of Longfin's shares traded, below the 5% minimum. Russell said it made the decision based on Longfin's IPO disclosures, which said more shares would trade.

Its reversal, announced March 26, sent the shares down 41% the next day. Mr. Meenavalli told the Journal Friday that the company now has a 7% free float thanks to the unlocking of some IPO shares. Mr. Meenavalli said Russell told him "they are going to include us back."

A spokesman for Russell said Longfin would be assessed like any other company during the next quarterly index update. The spokesman also confirmed that the Journal's calculation, based on available information, that only 4% of the shares are available for trading "is accurate."

Mr. Meenavalli said Longfin "went through a stringent process of [approval by] SEC and Nasdaq" and that its filings are being unfairly judged against the tougher standards set for bigger companies.

108.     Shortly thereafter, on April 6, 2018, the SEC unsealed a civil complaint involving the Company and announced that it had obtained a court order freezing more than $27 million in trading proceeds from allegedly illegal distributions and sales of restricted Longfin Class A Stock involving the Company, its CEO and three other affiliated individuals.  The press release stated in relevant part:

> According to a complaint unsealed today in federal court in Manhattan, shortly after Longfin began trading on NASDAQ and announced the acquisition of a purported cryptocurrency business, its stock price rose dramatically, and its market capitalization exceeded $3 billion. The SEC alleges that Amro Izzelden "Andy" Altahawi, Dorababu Penumarthi, and Suresh Tammineedi then illegally sold large blocks of their restricted Longfin shares to the public while the stock price was highly elevated. Through their sales, Altahawi, Penumarthi, and Tammineedi collectively reaped more than $27 million in profits.

> According to the SEC's complaint, Longfin's founding CEO and controlling shareholder, Venkata Meenavalli, caused the company to issue more than two million unregistered, restricted shares to Altahawi, who was the corporate secretary and a director of Longfin, and tens of thousands of restricted shares to two other affiliated individuals, Penumarthi and Tammineedi, who were allegedly acting as nominees for Meenavalli. The subsequent sales of those restricted shares violated federal securities laws that restrict trading in unregistered shares distributed to company affiliates.

> "We acted quickly to prevent more than $27 million in alleged illicit trading profits from being transferred out of the country," said Robert Cohen, Chief of the SEC Enforcement Division's Cyber Unit. "Preventing Defendants from transferring this money offshore will ensure that these funds remain available as the case continues."

> The SEC's complaint, which was filed under seal on April 4, charges Longfin, Meenavalli, Altahawi, Penumarthi, and Tammineedi with violating Section 5 of the Securities Act of 1933. The complaint seeks injunctive relief, disgorgement of ill-gotten gains, and penalties, among other relief.

109.     On April 6, 2018, NASDAQ reported that trading of Longfin's Class A Stock had been halted.  The press release stated in relevant part:

> The Nasdaq Stock Market® (Nasdaq: NDAQ) announced that trading was halted today in Longfin Corp. (Nasdaq: LFIN) at 10:01:38 Eastern Time for "additional information requested" from the company at a last sale price of $28.189. Trading will remain halted until Longfin Corp. has fully satisfied Nasdaq's request for additional information.

110.    The Company's stockholders had very little time to react to the announcement of the SEC action against the Company and NASDAQ's announcement halting LFIN's trading and, thus, many investors were unable to exit their positions prior to the halt.

111.    After the April 6 trading halt, there was no market for the Company's Class A Stock until May 24, 2018 – when the stock began trading on the OTC and was officially delisted from NASDAQ.

112.    When trading resumed on May 24, 2018, it opened at a price of $5.05 per share. By the time stockholders could sell their Class A Stock on the OTC, it had already declined over 96.46% in value.  The Company's shares are now trading for less than $1.50.

113.    On May 25, 2018, the SEC filed its amended complaint, which presented in great detail, Meenavalli and Altahawi's numerous violations of Section 5 of the Securities Act.

114.    As a result of the Defendants' actions, the market has lost all confidence in Longfin as illustrated by the Company's steep decline in value.  Longfin had a market capitalization of nearly $400 million on May 30, 2018 and in a span of less than six months, its market capitalization has decreased to less than $111 million.

115.    Additionally, as a direct and proximate result of the Individual Defendants' actions, Longfin stands to expend millions of dollars in legal fees and payments.  Moreover, these actions have irreparably damaged Longfin's corporate image and goodwill.  The Company will be hard pressed to raise equity capital or debt on favorable terms in the future.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

116.    Plaintiff brings this action derivatively for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties, gross mismanagement and unjust enrichment by Defendants.

117.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

118.    Plaintiff is a current owner of Longfin stock.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

119.    During wrongful course of conduct at the Company, the Board consisted of the Director Defendants.  As set forth herein, demand on the Board to institute this action is excused because such a demand would have been a futile and useless act.

120.    The Longfin Board is currently comprised of eight members – Defendants Meenavalli, Ratakonda, Patel, Dass, Gaddi, Nichols, Parker and non-party Avinash Karingam. Thus, under Delaware law, Plaintiff is required to show that at least four of the Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

121.    The Director Defendants either knew or willfully disregarded the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

122.    The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to stockholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

123.    Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, the Director Defendants are unable to

comply with their fiduciary duties and prosecute this action. Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

## THE DIRECTOR DEFENDANTS
## ARE NOT INDEPENDENT OR DISINTERESTED

**Defendant Meenavalli**

124.    Defendant Meenavalli is not disinterested or independent, and therefore, is incapable of considering demand because:  (i) Meenavalli (as CEO) made misrepresentations in, among other instances,  the Fund Announcement, the Ziddu.com Announcement, the Russell Announcement, and the December 13, 2017 Press Release; (ii) he is an employee of the Company who derives substantially all of his income from his employment with Longfin; and (iii) Meenavalli owns 55.1% of the outstanding shares of Longfin.  As such, Defendant Meenavalli cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.   In fact, on Longfin's own website, Defendant Meenavalli is not listed as an independent director.  Defendant Meenavalli is also a defendant in the Securities Class Action.

**Defendant Ratakonda**

125.    Defendant Ratakonda is not disinterested or independent, and therefore, is incapable of considering demand because (i) Defendant Ratakonda (as CFO) is responsible for the false statements made in the Registration Statement and 2017 Form 10-K, both of which he signed; and (ii) he is an employee of the Company who derives substantially all of his income from his employment with Longfin.  As such, Defendant Ratakonda cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would

expose him to liability and threaten his livelihood.  On Longfin's own website, Defendant Ratakonda is not listed as an independent director.  Defendant Ratakonda is also a defendant in the Securities Class Action.

**Defendant Gaddi**

126.    Defendant Gaddi is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Gaddi (as Chief Technical Officer) was responsible for the false statements made in the Registration Statement, which he signed and is an employee of the Company who derives substantially all of his income from his employment with Longfin.  As such, Defendant Gaddi cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.  On Longfin's website, Defendant Gaddi is not listed as an independent director.

**Defendant Patel**

127.    Defendant Patel is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Patel (as the Company's Global Head Officer) was responsible for the false statements made in the Registration Statement, which he signed and is an employee of the Company who derives substantially all of his income from his employment with Longfin.  As such, Defendant Patel cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.  On Longfin's website, Defendant Patel is not listed as an independent director.

**Defendant Dass**

128.    Defendant Dass has served as a Company director since August 2017 and is a member of the Audit Committee.  As a member of the Audit Committee, Defendant Dass conducted little, if any, oversight regarding the statements above, consciously disregarded his

duties to monitor such controls over reporting, and consciously disregarded his duties to protect corporate assets.   For these reasons, Defendant Dass breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is excused as futile.

**Defendant Nichols**

129.     Defendant Nichols has served as a Company director and is a member of the Audit Committee. As a member of the Audit Committee, Defendant Nichols conducted little, if any, oversight regarding the statements above, consciously disregarded his duties to monitor such controls over reporting, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, Defendant Nichols breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Parker**

130.     Defendant Parker has served as a Company director and is a member of the Audit Committee. As a member of the Audit Committee, Defendant Parker conducted little, if any, oversight regarding the statements above, consciously disregarded his duties to monitor such controls over reporting, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, Defendant Parker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is excused as futile.

**Additional Demand Futility Allegations**

131.     The other Director Defendants are beholden to Defendant Meenavalli, who faces a substantial likelihood of liability in the instant action, the Securities Class Action, and the SEC Action for his engagement in the misconduct discussed herein.   By virtue of his controlling

ownership of Company stock and his position as CEO, Defendant Meenavalli controls the Company and dominates the Board.

132.     Furthermore, it appears Defendants Meenavalli, Gaddi, Ratakonda and non-defendant Karingam have all served together for a lengthy period as directors and/or executive officers of Stampede Capital Ltd., along with Tammineedi and <u>Parthasarathi</u>.  Stampede Capital is purportedly a non-bank liquidity and technology solutions provider.  The company is engaged in stock broking business. The company's segment is securities and currencies broking and trading through stock exchanges in India.  Stampede Capital's stock trajectory mirrors that of Longfin.

133.     Finally, defendant Dass is affiliated with Meridian Enterprises and Ziddu.com: the "About Us" page of Ziddu.com lists Dass as "Chief Mentor."  Defendant Meenavalli owns and controls Meridian Enterprises, from which Longfin purportedly purchased Ziddu.com in a related party transaction.

## **FIRST CAUSE OF ACTION**
### **(Against the Individual Defendants for Breach of Fiduciary Duties)**

134.     Plaintiff incorporates by reference every allegation contained above.

135.     By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

136.      Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

137.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.

138.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities

lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

139.    Plaintiff, on behalf of Longfin, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### (Against the Individual Defendants for Unjust Enrichment)

140.    Plaintiff incorporates by reference every allegation set forth above

141.    By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

142.    During the Relevant Period, Defendants either received bonuses, stock options, or similar compensation from the Company that was tied to the financial performance or artificially inflated valuation of the Company or received compensation that was unjust in light of Defendants' bad faith conduct.

143.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

144.    Plaintiff on behalf of Longfin has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### (Against the Individual Defendants for Abuse of Control)

145.    Plaintiff incorporates by reference every allegation set forth above.

146.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Longfin, for which they are legally responsible.

147.    As a direct and proximate result of the Individual Defendants' abuse of control, Longfin has sustained significant damages. As a direct and proximate result of the Individual

Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Longfin has

sustained and continues to sustain significant damages. As a result of the misconduct alleged

herein, the Individual Defendants are liable to the Company.

148.    Plaintiff on behalf of Longfin has no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### (Against the Individual Defendants for Waste of Corporate Assets)

149.    Plaintiff incorporates by reference every allegation set forth above.

150.    As a further result of the foregoing, the Company has incurred significant legal

liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose

financing from investors and business from future customers who no longer trust the Company

and its products.

151.    As a result of the waste of corporate assets, the Individual Defendants are each

liable to the Company.

152.    Plaintiff on behalf of Longfin has no adequate remedy at law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action for which demand is

excused;

B.    Awarding, against the Individual Defendants and in favor of the Company, the

damages sustained by the Company as a result of the Individual Defendants' breaches of their

fiduciary duties;

C.    Directing the Company to take all necessary actions to reform and improve its

corporate governance and internal procedures, to comply with the Company's existing governance

obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 1, 2018                    Respectfully Submitted

**BRAGAR EAGEL & SQUIRE, P.C.**

By: */s/ Melissa A. Fortunato*_____
Melissa A. Fortunato (#MF0214)
Marion Passmore
Shaelyn Gambino Morrison
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone (212)308-5858
Facsimile: (212) 846-0462
Email:  fortunato@bespc.com
          passmore@bespc.com
          Gambino-morrison@bespc.com

**HYNES KELLER & HERNANDEZ, LLC**
Michael J. Hynes
101 Lindenwood Drive, Suite 225
Malvern, Pennsylvania 19355
Telephone:  (484) 875-3116
Facsimile:   (914) 752-3041
Email:  mhynes@hkh-lawfirm.com

*Attorneys for Plaintiff*